Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

**2316-CV01801**

## IN THE SIXTEENTH JUDICIAL CIRCUIT COURT OF
## JACKSON COUNTY, MISSOURI

| | | |
|---|---|---|
| JACKSON COUNTY, MISSOURI, on behalf of itself and the proposed Class, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| ELI LILLY AND COMPANY, | ) ) | **JURY TRIAL DEMANDED** |
| NOVO NORDISK, INC., | ) ) | |
| SANOFI-AVENTIS U.S. LLC, | ) ) | |
| EVERNORTH HEALTH, INC., EXPRESS SCRIPTS, INC., EXPRESS SCRIPTS ADMINISTRATORS, LLC ESI MAIL PHARMACY SERVICE, INC., EXPRESS SCRIPTS PHARMACY, INC., MEDCO HEALTH SOLUTIONS, INC., | ) ) ) ) ) ) ) | |
| CVS HEALTH CORPORATION, CVS PHARMACY, INC., CAREMARK RX LLC, CAREMARK PCS HEALTH, LLC, CAREMARK LLC, | ) ) ) ) ) ) | |
| UNITEDHEALTH GROUP, INC., OPTUM, INC., OPTUMRX, INC., OPTUMRX HOLDINGS LLC, and OPTUMINSIGHT, INC. | ) ) ) ) ) ) | |
| Defendants. | ) | |

## PETITION

Plaintiff, Jackson County, Missouri, on behalf of itself and the proposed Class, (the "County" or collectively "Plaintiffs"), brings this action against Defendants for benefits unjustly

1

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

conferred upon them by Jackson County and the Class. In support of its Petition, Jackson County alleges as follows:

## INTRODUCTION

1.      Diabetes is an epidemic and a public health crisis in Missouri, as well as Jackson County. Missouri has a high prevalence of diabetes with approximately 15% of its adult population living with diabetes. *See* Table 1, Missouri Diabetes Report (2021), available at https://health.mo.gov/living/healthcondiseases/chronic/chronicdisease/MissouriDiabetesReport.p df (last accessed June 22, 2022). Among Missouri's counties, Jackson County is in the highest quartile of Missouri counties with adults with diagnosed diabetes. *Id.* at Table 2.

2.      Despite the availability of effective treatment, in 2019, the death count for diabetes was 1,652, making it the seventh leading cause of death in Missouri. *Id.*

3.      In 2017, the American Diabetes Association (ADA) estimated that the direct medical cost and indirect cost of diabetes was $6.7 billion in Missouri. *Id.*

4.      Defendants Eli Lilly, Novo Nordisk, and Sanofi (collectively, "Manufacturer Defendants" or "Manufacturers") manufacture the vast majority of insulins and other diabetic medications available in Missouri.

5.      Defendants CVS Caremark, Express Scripts, and OptumRx collectively dominate the pricing system for the at-issue drugs (collectively, "PBM Defendants" or "PBMs").[1] The PBM Defendants' dominance results from the reality that these three corporate actors are, at once: (1) the largest pharmacy benefit managers in the United States and in Missouri (controlling approximately 80% of the PBM market); (2) the largest pharmacies in the United States and in

---

[1] In the context of this Petition, the "at-issue drugs" are Humulin N, Humulin R, Humalog, Trulicity, Basaglar, Lantus, Toujeo, Apidra, Soliqua, Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

Missouri (making up 3 of the top 5 dispensing pharmacies in the U.S.); and (3) housed within the same corporate families as three of the largest insurance companies in the United States and in Missouri—Aetna (CVS Caremark), Cigna (Express Scripts), and UnitedHealthcare (OptumRx).

6.      As part of their work, PBM Defendants establish standard formulary offerings (i.e., approved drug lists). If a drug is not included on a formulary, then it is not covered by health insurance.

7.      PBM Defendants understand that their standard formulary offerings drive drug utilization.

8.      Because the three PBM Defendants control 80% of the pharmacy benefit market, unless they include a drug on one of their standard formulary offerings, it is not available to the vast majority of Missouri citizens.

9.      The Manufacturers likewise understand that PBMs' standard formularies drive drug utilization—if Manufacturers want their drugs to be prescribed and paid for, they must obtain preferrable formulary position on the PBM Defendants' formularies.

10.     Given the PBMs' market power and the crucial role their standard formularies play in the pharmaceutical pricing chain, both Defendant groups understand that the PBM Defendants wield enormous control over drug prices and drug purchasing behavior.

11.     The unconscionable and deceptive scheme at the root of this Petition—the Insulin Pricing Scheme[2]—was born from this mutual understanding.

12.     Over the course of the last fifteen years, and pursuant to the Insulin Pricing Scheme, Manufacturer Defendants have in lockstep raised the prices of their respective diabetes drugs in

---

[2] The Insulin Pricing Scheme is further defined in paragraphs 21-24, *infra*.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

an astounding manner, even though the cost to produce these drugs has decreased during that same time period.

13.     Insulins, which today cost Manufacturer Defendants less than $2 per drug to produce, and which were originally released at a list price of $20 per drug in the late 1990s, now carry list prices that range between $300 and $700 per drug.

14.     In the last decade alone, Manufacturer Defendants have increased the prices of their insulins over 1,000%.

15.     For example, Figure 1 illustrates the rate at which Defendant Eli Lilly raised the price of its analog insulin Humalog, compared to the rate of inflation for other consumer goods and services from 1997-2018.

**Figure 1: January 1997 to December 2017 Price Changes to Humalog[3]**

---

[3] *See* The Price of Insulin vs. The Price of Other Goods (July 18, 2019), available at
https://insulin.substack.com/p/the-price-of-insulin-vs-the-price (last accessed June 22, 2022).

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM



Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

16.     Figure 1 reflects a 1171% price increase in Humalog insulin over the course of 20 years, yet nothing about these medications has changed; today's $350 insulin is the exact drug Defendants originally sold for $20.

17.     The high cost of insulin is a uniquely American problem. In the United States, the average price per unit across all types of insulin in 2018 was $98.70. In a comparison study of other countries, the RAND Institute found that "the closest any country came to paying the $98.70 American average was the $21.48 average that Chile pays." *See* Doug Irving, *The Astronomical Price of Insulin Hurts American Families*, RAND Review (Jan. 6, 2021) (available at https://www.rand.org/blog/rand-review/2021/01/the-astronomical-price-of-insulin-hurts-american-families.html) (last accessed June 22, 2022). The problem is more exacerbated for rapid-acting insulin (approximately one-third of the American market); its average in other countries was just over $8, but the average in America was $119. *Id.*

18.     According to RAND, the following table expresses the average insulin cost in the United States compared to other key countries:

| Average price per unit across all types of insulin in 2018 | |
| --- | --- |
| Canada | $12 |
| Germany | $11 |
| France | $9.08 |
| United Kingdom | $7.52 |
| Australia | $6.94 |
| *United States* | *$98.70* |

19.     Put another way, "[t]he average price in America, across all types of insulin, was **more than ten times higher** than the average for all of the other countries combined." *Id.*

20.     Both Manufacturer and PBM Defendants play vital roles and profit immensely from the Insulin Pricing Scheme and the artificially inflated prices produced by it.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

21.     Specifically, the Insulin Pricing Scheme works as follows: first, to gain formulary access from the PBM Defendants for their diabetic treatments, Manufacturer Defendants artificially and willingly raise their list prices, and then pay an undisclosed portion of that price back to the PBMs. These Manufacturer Payments[4] are provided under a variety of labels, yet, however they are described, these Manufacturer Payments, along with the inflated list prices, are quid pro quo for formulary inclusion on the PBMs' standard offerings.

22.     The list prices for the at-issue drugs have become so untethered from the net prices realized by the Manufacturers as to constitute a false price.

23.     In exchange for these payments from Manufacturer Defendants, PBMs then grant preferred status on their standard formularies based upon the largest Manufacturer Payment and the highest inflated list price—which the PBMs know to be artificially inflated and which the PBMs insist that their payor clients use as the basis for the price they pay for the at-issue drugs.

24.     The Insulin Pricing Scheme creates a "best of both worlds" scenario for Defendants. Manufacturer Defendants can make these undisclosed Manufacturer Payments to buy preferred formulary position—which significantly increases their revenue—without sacrificing their profits.

25.     PBM Defendants profit off the inflated list prices that result from the scheme in numerous ways, including: (1) retaining a significant—yet undisclosed— percentage of the Manufacturer Payments, either directly or through wholly-owned rebate aggregators; (2) using the inflated list price produced by the Insulin Pricing Scheme to generate profits from pharmacies in

---

[4] In the context of this Petition, the term "Manufacturer Payments" is defined as all payments or financial benefits of any kind conferred by the Manufacturer Defendants to PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on the PBM's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries. Manufacturer Payments includes rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price, or margin guarantees and any other form of consideration exchanged. This broad definition is necessary because PBMs historically have continued to change and evolve the nature of their payment streams to avoid disclosure.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

their networks; and (3) relying on those same inflated list prices to drive up the PBMs' profits through their own pharmacies.

26.      Thus, while the PBM Defendants represent both publicly and to their clients that they use their market power to drive down prices for diabetes medications, these representations are false.

27.      Rather, the PBMs drive up the price of the at-issue drugs. Indeed, the Manufacturer Payments that the PBMs receive in exchange for preferred formulary position, along with the PBMs' actual formulary construction, are responsible for the skyrocketing price of the at-issue diabetes medications.

28.      Because the price paid by nearly every diabetic and payor is based upon the artificially inflated list prices generated by Defendants' scheme, the Insulin Pricing Scheme directly harms every diabetic and payor in Missouri who purchases these life-sustaining drugs, including employers who underwrite and subsidize health insurance plans.

29.      Jackson County and members of the Class, as payors for the at-issue drugs through their employee health plans, have been overcharged.

30.      Jackson County, on behalf of itself and the proposed Class alleged herein, brings this action: (a) on behalf of the County and members of the Class as payors for and purchasers of the at-issue diabetes medications through its health plans; (b) on behalf of the County and the members of the Class for additional costs they have and will incur as a result of the Insulin Pricing Scheme; and (c) for injunctive relief that will halt the Insulin Pricing Scheme.

31.      The relevant period for damages alleged in this Petition is from 2003 continuing through the present.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

## PARTIES

### Plaintiff

32.     Jackson County, Missouri is a home rule charter county. It is a political subdivision of the State of Missouri that may sue and plead in its own name. Jackson County is the named Plaintiff and proposed Class Representative in this action.

33.     Members of the proposed Class include Missouri counties and municipalities with a population greater than 20,000 according to the 2020 United States Census. Members of the proposed Class are listed in Exhibit A, attached hereto.

### Manufacturer Defendants

34.     **Defendant Eli Lilly and Company ("Eli Lilly")** is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

35.     Eli Lilly is registered to do business in Missouri (Charter No. F00014930) and may be served through its registered agent: National Registered Agents, Inc.; 120 South Central Avenue; Clayton, Missouri 63105.

36.     Eli Lilly holds four active Distributor Licenses in Missouri (License Nos. 2006002677, 2006002678, 2006002679, and 2016021953).

37.     These licenses allow Eli Lilly to manufacture, distribute, and sell its at- issue drugs in Missouri.

38.     In Missouri, Eli Lilly promotes and distributes several at-issue diabetes medications: Humulin N, Humulin R, Humalog, Trulicity, and Basaglar.

39.     Eli Lilly's global revenues in 2019 were $4.13 billion from Trulicity, $2.82 billion from Humalog, $1.29 billion from Humulin, and $1.11 billion from Basaglar.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

40.    Eli Lilly's global revenues in 2018 were $3.2 billion from Trulicity, $2.99 billion from Humalog, $1.33 billion from Humulin, and $801 million from Basaglar.

41.    Eli Lilly transacts business in Missouri and targets Missouri for its products, including the at-issue diabetes medications.

42.    Eli Lilly employs sales representatives throughout Missouri to promote and sell Humulin N, Humulin R, Humalog, Trulicity, and Basaglar.

43.    Eli Lilly also directs advertising and informational materials to Missouri physicians, payors, and diabetics for the specific purpose of selling more of the at-issue drugs in Missouri and profiting from the Insulin Pricing Scheme.

44.    At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Eli Lilly caused its artificially inflated list prices for the at-issue diabetes medications to be published throughout Missouri.

45.    During the relevant time period, Jackson County and members of the Class, through their employee health plans, purchased Eli Lilly's at-issue diabetes medications at a price based on inflated list prices generated by the Insulin Pricing Scheme.

46.    **Defendant Sanofi-Aventis U.S. LLC ("Sanofi")** is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

47.    Sanofi is registered to do business in Missouri (Charter No. FL0737422) and may be served through its registered agent: CSC-Lawyers Incorporating Service Company; 221 Bolivar Street; Jefferson City, Missouri 65101.

48.    Sanofi holds three active Wholesale Distributor Licenses in Missouri (License Nos. 2004025897, 2015010661, and 2008011679).

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

49.     These licenses allow Sanofi to manufacture, distribute, and sell its at-issue drugs in Missouri.

50.     Sanofi promotes and distributes pharmaceutical drugs in Missouri, including several at-issue diabetes medications: Lantus, Toujeo, Soliqua, and Apidra.

51.     Sanofi's global revenues in 2019 were $3.50 billion from Lantus, $1.03 billion from Toujeo, $400 million from Apidra, and $144 million from Soliqua.

52.     Sanofi's global revenues in 2018 were $3.9 billion from Lantus, $923 million from Toujeo, $389 million from Apidra, and $86 million from Soliqua.

53.     Sanofi transacts business in Missouri and targets Missouri for its products, including the at-issue diabetes medications.

54.     Sanofi employs sales representatives throughout Missouri to promote and sell Lantus, Toujeo, Soliqua, and Apidra.

55.     Sanofi also directs advertising and informational materials to Missouri physicians, payors, and diabetics for the specific purpose of selling more of the at-issue drugs in Missouri and profiting from the Insulin Pricing Scheme.

56.     At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Sanofi caused its artificially inflated list prices for the at-issue diabetes medications to be published throughout Missouri.

57.     During the relevant time period, Jackson County and members of the Class, through their employee health plans, purchased Sanofi's at-issue diabetes medications at prices based on artificially inflated list prices generated by the Insulin Pricing Scheme.

58.     **Defendant Novo Nordisk Inc. ("Novo Nordisk")** is a Delaware corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

59.     Novo Nordisk is registered to do business in Missouri (Charter No. F00948384) for the purpose of pharmaceutical sales; it may be served through its registered agent: CT Corporation System; 120 South Central Avenue; Clayton, Missouri 63105.

60.     Novo Nordisk promotes and distributes pharmaceutical drugs in Missouri, including the at-issue diabetic medications: Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

61.     Novo Nordisk's global revenues in 2019 were $2.89 billion from Novolog, $973 million from Levemir, $968 million from Tresiba, $2.29 billion from Victoza, $248.3 million from Novolin, and $1.17 billion from Ozempic.

62.     Novo Nordisk's global revenues in 2018 were $4.19 billion from Novolog, $1.66 billion from Levemir, $1.19 billion from Tresiba, $3.61 billion from Victoza, $284.5 million from Novolin, and $185 million from Ozempic.

63.     Novo Nordisk transacts business in Missouri and targets Missouri for its products, including the at-issue diabetes medications.

64.     Novo Nordisk employs sales representatives throughout Missouri to promote and sell Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

65.     Novo Nordisk also directs advertising and informational materials to Missouri physicians, payors, and diabetics for the specific purpose of selling more of the at-issue drugs in Missouri.

66.     At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Novo Nordisk caused its artificially inflated list prices for the at-issue diabetes medications to be published throughout Missouri.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

67.     During the relevant time period, Jackson County and members of the Class, through their employee health plans, purchased Novo Nordisk's at-issue diabetes medications at prices based on artificially inflated list prices generated by the Insulin Pricing Scheme.

68.     Collectively, Defendants Eli Lilly, Novo Nordisk, and Sanofi are referred to as "Manufacturer Defendants" or "Manufacturers."

### PBM Defendants

69.     **Defendant CVS Health Corporation ("CVS Health")** is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Health transacts business and has locations throughout the United States and Missouri.

70.     CVS Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

71.     CVS Health, through its executives and employees, is directly involved in the PBM services and formulary construction related to the Insulin Pricing Scheme.

72.     During the relevant time, CVS Health (or its predecessor)[5] has repeatedly, continuously, and explicitly stated that CVS Health:

a.   "design[s] pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members and helping improve health outcomes;"[6]

---

[5] Until 2014, CVS Health was known as "CVS Caremark." In September 2014, CVS Caremark Corporation announced that "it is changing its corporate name to CVS Health to reflect its broader health care commitment and its expertise in driving the innovations needed to shape the future of health."

[6] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

b.   "negotiate[s] with pharmaceutical companies to obtain discounted acquisition costs for many of the products on [CVS Health's] drug lists, and these negotiated discounts enable [CVS Health] to offer reduced costs to clients;"[7]

c.   "utilize[s] an independent panel of doctors, pharmacists, and other medical experts, referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on [CVS Health's] drug lists."[8]

73.   CVS Health publicly represents that CVS Health constructs programs that lower the costs of the at-issue diabetes medications. For example, in 2016, CVS Health announced a new program to "reduce overall spending in diabetes" that is available in all states, stating:

> "CVS Health introduced a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, lower pharmacy costs [for diabetes medications] through aggressive trend management and decreased medical costs . . . [and that] participating clients could save between $3000 to $5000 per year for each member who successfully improves control of their diabetes" (emphasis supplied).

74.   In 2017, CVS Health stated that "CVS Health pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year the lowest in five years. Despite manufacturer price increases of nearly 10 percent, CVS Health kept drug price growth at a minimal 0.2 percent."

75.   In November 2018, CVS Health acquired Aetna for $69 billion and became the first combination of a major health insurer, PBM, mail order, and retail pharmacy chain. As a result, CVS Health controls the health plan/insurer, the PBM, and the pharmacies utilized by

---

[7] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2013).

[8] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

approximately 40 million Aetna members in the United States. CVS Health controls the entire drug pricing chain for these 40 million Americans.

76. **Defendant CVS Pharmacy, Inc. ("CVS Pharmacy")** is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy is a wholly-owned subsidiary of CVS Health.

77. CVS Pharmacy is registered to do business in Missouri (Charter No. F00580215) and may be served at its registered agent: CT Corporation System; 120 South Central Avenue; Clayton, Missouri 63105.

78. CVS Pharmacy maintains three Wholesale Distributor Licenses in Missouri (License Nos. 2018016879, 2018015114, and 2010010031).

79. These licenses allow CVS Pharmacy to distribute and sell its at-issue drugs in Missouri.

80. CVS Pharmacy owns and operates dozens of pharmacies throughout Missouri that were directly involved in and profited from the Insulin Pricing Scheme.

81. CVS Pharmacy is the immediate and direct parent of Defendant Caremark Rx, LLC.

82. During the relevant time period, CVS Pharmacy provided retail pharmacy services in Missouri that gave rise to the Insulin Pricing Scheme.

83. **Defendant Caremark Rx, LLC** is a Delaware limited liability company and its principal place of business is at the same location as CVS Pharmacy and CVS Health.

84. Caremark Rx, LLC is a wholly-owned subsidiary of Defendant CVS Pharmacy.

85. Caremark Rx, LLC may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

86.     During the relevant time period, Caremark Rx, LLC provided PBM and mail order pharmacy services in Missouri that gave rise to the Insulin Pricing Scheme.

87.     **Defendant Caremark LLC** is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark, LLC is a wholly-owned subsidiary of Caremark Rx, LLC.

88.     Caremark LLC is registered to do business in Missouri (Charter No. FL0829857) and may be served through its registered agent: CT Corporation System; 120 South Central Avenue; Clayton, Missouri 63105.

89.     Caremark, LLC holds one active Wholesale Distributor License (License No. 900964) and four Pharmacy Licenses (License Nos. 005981, 2017041619, 2019022262, and 2020004215) in Missouri.

90.     During the relevant time period, Caremark, LLC provided PBM and mail order pharmacy services in Missouri that gave rise to the Insulin Pricing Scheme.

91.     **Defendant CaremarkPCS Health, LLC** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CVS Health is the direct or indirect parent company of CaremarkPCS Health LLC.

92.     CaremarkPCS Health, LLC provides pharmacy benefit management services.

93.     CaremarkPCS Health, LLC is registered to do business in Missouri (Charter No. FL0950751) and may be served through its registered agent: CT Corporation System; 120 South Central Avenue; Clayton, Missouri 63105.

94.     During the relevant time period, CaremarkPCS Health, LLC provided PBM services in Missouri, which gave rise to the Insulin Pricing Scheme.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

95.     As a result of numerous interlocking directorships and shared executives, Caremark Rx, LLC, CVS Pharmacy, and CVS Health are directly involved in the conduct of and control of CaremarkPCS Health, LLC and Caremark, LLC's operations, management, and business decisions related to the at-issue formulary construction, Manufacturer Payments, and mail order and retail pharmacy services.

96.     Collectively, Defendants CVS Health, CVS Pharmacy, Caremark Rx, LLC, Caremark, LLC, and CaremarkPCS Health, LLC, including all predecessor and successor entities, are referred to as "CVS Caremark."

97.     CVS Caremark is named as a Defendant in its capacities as a PBM, and retail and mail order pharmacy.

98.     In its capacity as a PBM, CVS Caremark coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the artificially-inflated list prices for the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on CVS Caremark's formularies.

99.     CVS Caremark has the largest PBM market share based on total prescription claims managed, representing approximately 40% of the national market. CVS Caremark's pharmacy services segment generated $141.5 billion in total revenues last year.

100.    At all times relevant hereto, CVS Caremark offered pharmacy benefit services to Missouri payors, and derived substantial revenue therefrom.

101.    At all times relevant hereto, CVS Caremark maintained standard formularies that are used nationwide, including by CVS Caremark's payor clients in Missouri. During the relevant time period, these standard formularies included the at-issue diabetes medications.

102.    At all times relevant hereto, and contrary to all its express representations, CVS Caremark has knowingly insisted that its payor clients, including in Missouri, use the artificially

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

inflated list prices produced by the Insulin Pricing Scheme as the basis for payment for the price paid for the at-issue drugs.

103.    At all times relevant hereto, CVS Caremark has concealed its critical role in the generation of those artificially inflated list prices.

104.    At all times relevant hereto, CVS Caremark had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid to CVS Caremark and placement on CVS Caremark's standard formularies, as well as agreements related to the Manufacturers' at-issue drugs sold through CVS Caremark's mail order and retail pharmacies, including those located in Missouri.

105.    **Defendant Evernorth Health, Inc.** ("Evernorth"), formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.[9] Evernorth is registered to do business in Missouri under Charter No. F01396834.

106.    Evernorth may be served through its registered agent: CT Corporation System, 120 South Central Avenue, Clayton, Missouri 63105.

107.    Evernorth, through its executives and employees, is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme.

108.    Evernorth executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

---

[9] Until 2021, Evernorth Health, Inc. conducted business under the name Express Scripts Holding Company. For the purposes of this Petition "Evernorth" refers to Evernorth Health, Inc. and Express Scripts Holding Company.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

109.    Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Missouri, which engaged in the activities that gave rise to this Petition.

110.    In December 2018, Evernorth merged with Cigna in a $67 billion deal to consolidate their businesses as a major health insurer, PBM, and mail-order pharmacy. As a result, the Evernorth corporate family controls the health plan/insurer, the PBM, and the mail-order pharmacies utilized by approximately 15 million Cigna members in the United States and in Missouri. Evernorth controls the entire drug pricing chain for these 15 million Americans.

111.    In each annual report for at least the last decade, Evernorth has stated:[10]

    a.   "[Evernorth] is one of the largest PBMs in North America . . . [and Evernorth] help[s] health benefit providers address access and affordability concerns resulting from rising drug costs while helping to improve healthcare outcomes."

    b.   "[Evernorth] manage[s] the cost of the drug benefit by . . . assists in controlling costs; evaluat[es] drugs for efficacy, value, and price to assist[ing] clients in selecting a cost-effective formulary; [and] offer[s] cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors [and better care for members] leveraging purchasing volume to deliver discounts to health benefit providers."

    c.   "[Evernorth] works with clients, manufacturers, pharmacists, and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes."

---

[10] Express Scripts Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

112.    **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly-owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

113.    Express Scripts, Inc. is registered to do business in Missouri (Charter No. F00367343) and may be served through its registered agent: CT Corporation System; 120 South Central Avenue; Clayton, Missouri 63105.

114.    Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Missouri.

115.    During the relevant time period, Express Scripts Inc. was directly involved in the PBM and mail-order pharmacy services, which gave rise to the Insulin Pricing Scheme.

116.    **Defendant Express Scripts Administrators, LLC**, is a Delaware limited liability company and is a wholly-owned subsidiary of Evernorth.

117.    Express Scripts Administrators, LLC is registered to do business in Missouri (Charter No. FL0077592) and may be served through its registered agent: CT Corporation System; 120 South Central Avenue; Clayton, Missouri 63105.

118.    During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in Missouri discussed in this Petition that gave rise to the Insulin Pricing Scheme.

119.    **Defendant Medco Health Solutions, Inc.** ("Medco") is a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri 63121.

120.    Medco is registered to do business in Missouri (Charter No. F00510384) and may be served through its registered agent: CT Corporation System; 120 South Central Avenue; Clayton, Missouri 63105.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

121.    Prior to 2012, Medco provided the at-issue PBM and mail order services in Missouri, which gave rise to the Insulin Pricing Scheme.

122.    In 2012, Express Scripts acquired Medco for $29 billion.

123.    Prior to the merger, Express Scripts and Medco were two of the largest PBMs in the United States.

124.    Following the merger, all of Medco's PBM and mail-order pharmacy functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's payor customers becoming Express Scripts' customers. The combined company covered more than 155 million lives at the time of the merger.

125.    At the time of the merger, on December 6, 2011, in his testimony before the Senate Judiciary Committee, then-CEO of Medco, David B. Snow, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined entity will achieve even greater [Manufacturer Payments] from drug manufacturers and other suppliers."

126.    The then-CEO of Express Scripts, George Paz, during a congressional subcommittee hearing in September 2011, echoed these sentiments: "A combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines."

127.    **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly-owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Evernorth.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

128.    ESI Mail Pharmacy Service, Inc. is registered to do business in Missouri (Charter No. F00477696) and may be served through its registered agent: CT Corporation System; 120 South Central Avenue; Clayton, Missouri 63105.

129.    ESI Mail Pharmacy Service, Inc. holds six Retail Pharmacy Licenses in Missouri (License Nos. 2010008501, 2000148285, 2000162445, 2000168506, 2000172436, and 2003010206).

130.    During the relevant time period, ESI Mail Pharmacy Service provided the mail order pharmacy services in Missouri discussed in this Petition, which gave rise to the Insulin Pricing Scheme.

131.    **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly-owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

132.    Express Scripts Pharmacy, Inc. is registered to conduct business in Missouri (Charter No. F01396832) and may be served through its registered agent: CT Corporation System; 120 South Central Avenue; Clayton, Missouri 63105.

133.    Express Scripts Pharmacy, Inc. holds six active Retail Pharmacy Licenses in Missouri (License Nos. 2014003743, 2014004518, 2014037469, 2014001047, 2014027634, and 2014004516).

134.    During the relevant time period, Express Scripts Pharmacy, Inc. provided the mail order pharmacy services in Missouri discussed in this Petition.

135.    As a result of numerous interlocking directorships and shared executives, Evernorth and Express Scripts, Inc. are directly involved in the conduct and control of Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., and Express

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

Scripts Pharmacy, Inc.'s operations, management, and business decisions related to the at-issue formulary construction, Manufacturer Payments, and mail-order pharmacy services.

136.     Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts."

137.     Express Scripts is named as a Defendant in its capacities as a PBM and mail-order pharmacy.

138.     In its capacity as a PBM, Express Scripts coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the artificially inflated list prices for the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on Express Script's formularies.

139.     Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States. During the relevant period of this Petition, Express Scripts controlled 30% of the PBM market in the United States.

140.     Express Scripts has only grown larger since the Cigna merger.

141.     In 2017, annual revenue for Express Scripts was more than $100 billion.

142.     As of December 31, 2018, more than 68,000 retail pharmacies, representing more than 98% of all retail pharmacies in the nation, participated in one or more of Express Scripts' networks.

143.     At all times relevant hereto, Express Scripts offered pharmacy benefit services, and derived substantial revenue therefrom, in Missouri and provided the at-issue PBM services to numerous payors in Missouri.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

144.    At all times relevant hereto, and contrary to all of their representations, Express Scripts has knowingly insisted that its payor clients, including those in Missouri, use the artificially-inflated list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

145.    At all times relevant hereto, Express Scripts has concealed its critical role in the generation of those artificially inflated list prices.

146.    At all times relevant hereto, Express Scripts maintained standard formularies that are used nationwide. During the relevant time period, those formularies included the at-issue diabetes medications.

147.    During certain years when some of the largest at-issue price increases occurred, including in 2013 and 2014, Express Scripts worked directly with OptumRx to negotiate Manufacturer Payments on behalf of OptumRx and its clients in exchange for preferred formulary placement. For example, in a February 2014 email released by the U.S. Senate in conjunction with its January 2021 report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug" ("January 2021 Senate Insulin Report"), Eli Lilly describes a "Russian nested doll situation" in which Express Scripts was negotiating rebates on behalf of OptumRx related to the at-issue drugs for Cigna (who later would become part of Express Scripts).

148.    In its capacity as a mail order pharmacy, Express Scripts received payments from Missouri payors based on the artificially inflated prices produced by the Insulin Pricing Scheme.

149.    At all times relevant hereto, Express Scripts derived substantial revenue providing mail-order pharmacy services in Missouri.

150.    Express Scripts purchases drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, for dispensing through its mail order pharmacies.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

151.    At all times relevant hereto, Express Scripts had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid to Express Scripts and placement on Express Scripts' standard formularies, as well as agreements related to the Manufacturers' at-issue drugs sold through Express Scripts' mail order and retail pharmacies, including those located in Missouri.

152.    **Defendant UnitedHealth Group, Inc.** ("UnitedHealth Group") is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

153.    UnitedHealth Group, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

154.    UnitedHealth Group, Inc. is a diversified managed healthcare company. In 2015, UnitedHealth Group listed revenue ioptun excess of $257 billion, and the company is currently ranked sixth on the Fortune 500 list. UnitedHealth Group, Inc. offers a spectrum of products and services including health insurance plans through its wholly-owned subsidiaries and pharmacy benefits through its PBM, OptumRx.

155.    More than one-third of the overall revenues of UnitedHealth Group come from OptumRx.

156.    UnitedHealth Group was directly involved in the conduct that caused the Insulin Pricing Scheme.

157.    UnitedHealth Group, through its executives and employees, is directly involved in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme. For example, executives of

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

UnitedHealth Group structure, analyze, and direct the company's overarching, enterprise-wide policies, including PBM and mail order services, as a means of maximizing profits across the corporate family.

158.  UnitedHealth Group's Sustainability Report states that "OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies – or drug lists – to ensure people get the right medications. [UnitedHealth Group] then negotiate[s] with pharmacies to lower costs at the point of sale . . . [UnitedHealth Group] also operate[s] [mail order pharmacies] . . . [UnitedHealth Group] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic drug supply, and a reliance on that drug supply."

159.  UnitedHealth Group's conduct had a direct effect in Missouri, and damaged payors in Missouri.

160.  In addition to being a PBM and a mail-order pharmacy, UnitedHealth Group owns and controls a major health insurance company, UnitedHealthcare. As a result, UnitedHealth Group controls the health plan/insurer, the PBM, and the mail- order pharmacies utilized by approximately 26 million UnitedHealthcare members in the United States. UnitedHealth Group controls the entire drug pricing chain for these 26 million Americans.

161.  **Defendant Optum Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc.[11]

162.  Optum Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

---

[11] UnitedHealth Group, Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2018).

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

163.   Optum Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme.

164.   For example, according to Optum Inc.'s press releases, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform serving the broad healthcare marketplace, including care providers, plan sponsors, payors, life sciences companies and consumers." In this role, Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth and OptumRx" and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary construction and mail-order activities.

165.   **Defendant OptumInsight, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

166.   OptumInsight, Inc. is registered to do business in Missouri (Charter No. F00435693) and may be served through its registered agent: The Corporation Company; 120 South Central Avenue, Suite 400; Clayton, Missouri 63105.

167.   OptumInsight, Inc. is an integral part of the Insulin Pricing Scheme, and during the relevant time period, OptumInsight coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy. OptumInsight analyzed data and other information from the Manufacturer Defendants to advise Defendants with regard to the profitability of the Insulin Pricing Scheme to the benefit of all Defendants.

168.   **Defendant OptumRx Holdings, LLC**, is a Delaware limited liability corporation with a principal place of business at 2300 Main Street, Irvine, California 92614.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

169.     OptumRx Holdings, LLC may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

170.     OptumRx Holdings, LLC provides pharmacy benefit management services through its subsidiaries to various payors in Missouri.

171.     **Defendant OptumRx, Inc.** is a California corporation with its principal place of business at 2300 Main St., Irvine, California, 92614.

172.     OptumRx, Inc. is registered to do business in Missouri (Charter No. F00451557) and may be served through its registered agent: CT Corporation System; 120 South Central Avenue, Suite 400; St. Louis, Missouri 63105.

173.     OptumRx, Inc. holds five active Retail Pharmacy Licenses in Missouri (License Nos. 2018045267, 2006031441, 2001032366, 2018043427, and 20180437889).

174.     During the relevant time period, OptumRx, Inc. provided the PBM and mail-order pharmacy services in Missouri that gave rise to the Insulin Pricing Scheme.

175.     As a result of numerous interlocking directorships and shared executives, UnitedHealth Group, OptumRx Holdings, LLC and Optum, Inc. are directly involved in the conduct and control of OptumInsight and OptumRx's operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail-order pharmacy services.

176.     Collectively, Defendants UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight, Inc., OptumRx Holdings LLC, and Optum, Inc., including all predecessor and successor entities, are referred to as "OptumRx."

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

177.    OptumRx is named as a Defendant in its capacities as a PBM and mail-order pharmacy.

178.    In its capacity as a PBM, OptumRx coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the artificially inflated list prices for the at-issue diabetes medications, as well as, for the placement of these firms' diabetes medications on OptumRx's drug formularies

179.    OptumRx provides PBM services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities.

180.    In 2019, OptumRx managed more than $96 billion in pharmaceutical spending, with a revenue of $74 billion.

181.    As illustrated in Figure 13, OptumRx rose to power through numerous mergers with other PBMs. For example, in 2012, a large PBM, SXC Health Solutions bought one of its largest rivals, Catalyst Health Solutions Inc. in a roughly $4.14 billion deal. Shortly thereafter, SXC Health Solutions Corp. renamed the company Catamaran Corp. Following this, UnitedHealth Group bought Catamaran Corp in a deal worth $12.8 billion and combined Catamaran with OptumRx.

182.    Prior to merging with OptumRx, Catalyst Health Solutions, Inc. and Catamaran Corp. engaged in the at-issue PBM and mail-order activities in Missouri.

183.    At all times relevant hereto, OptumRx derived substantial revenue providing pharmacy benefits in Missouri.

184.    At all times relevant hereto, and contrary to all their express representations, OptumRx has knowingly insisted that its payor clients use the artificially inflated list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

185.    At all times relevant hereto, OptumRx has concealed its critical role in the generation of those artificially-inflated list prices.

186.    At all times relevant hereto, OptumRx offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide. During the relevant time period, those formularies included the at-issue diabetes medications.

187.    In its capacity as a mail-order pharmacy, OptumRx received payments from Missouri payors based on the artificially inflated prices produced by the Insulin Pricing Scheme.

188.    At all times relevant hereto, OptumRx purchased drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, and dispensed the at-issue medications to diabetics.

189.    At all times relevant hereto, OptumRx had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx's mail order pharmacies.

190.    Collectively, CVS Caremark, OptumRx, and Express Scripts are referred to as "PBM Defendants" or "PBMs."

191.    Collectively, the "PBM Defendants" and the "Manufacturer Defendants" are referred to as "Defendants."

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

192.     In sum, the following chart outlines the relationship among Defendants:

| MANUFACTURER DEFENDANTS | PBM DEFENDANTS |
|---|---|
| **Eli Lilly** | **CVS Caremark Defendants**<br><br>• CVS Health<br>• CVS Pharmacy<br>• Caremark Rx LLC<br>• Caremark LLC<br>• CaremarkPCS Health LLC |
| **Novo Nordisk** | **Express Scripts Defendants**<br><br>• Evernorth Health, Inc.<br>• Express Scripts, Inc.<br>• Express Scripts Administrators, LLC<br>• ESI Mail Pharmacy Service, Inc.<br>• Medco Health Solutions, Inc.<br>• Express Scripts Pharmacy, Inc. |
| **Sanofi-Aventis** | **OptumRx Defendants**<br><br>• UnitedHealth Group, Inc.<br>• Optum, Inc.<br>• OptumInsight, Inc.<br>• OptumRx Holdings, LLC<br>• OptumRx, Inc. |

## JACKSON COUNTY, MISSOURI'S INTEREST

193.     This action seeks, on behalf of Jackson County, Missouri and members of the proposed Class, legal and equitable relief to redress injury and damage, as well as injunctive relief seeking an end to Defendants' misconduct. Jackson County and the proposed Class have been damaged, and continue to be damaged, by the Insulin Pricing Scheme.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

194.    Further, as a direct result of the Insulin Pricing Scheme, Jackson County and members of the Class have been damaged by having to pay overcharges as payors for and purchasers of the at-issue drugs.

## JURISDICTION AND VENUE

195.    This Court has general jurisdiction under Mo. Rev. Stat. § 478.220.

196.    The Petition does not confer diversity jurisdiction upon the federal courts pursuant to 28 U.S.C. § 1332 because complete diversity does not exist. Jackson County, Missouri and members of the Class are exclusively Missouri entities. Similarly, several Express Scripts entities are Missouri entities by virtue of maintaining their principal place of business within Missouri, including:

- Evernorth Health, Inc.;

- Express Scripts, Inc.;

- ESI Mail Pharmacy Service, Inc.;

- Express Scripts Pharmacy, Inc.; and

- Medco Health Solutions, Inc.

197.    Similarly, the Petition does not confer federal court jurisdiction under the Class Action Fairness Act because "the number of members of all proposed plaintiff classes in the aggregate is less than 100." 28 U.S.C. § 1332(d)(5)(B).

198.    Furthermore, it would be inappropriate for a court to exercise CAFA jurisdiction because the Class consists of Missouri entities exclusively that make up "greater than two-thirds" of the Class, and several defendants are Missouri citizens "from whom significant relief is sought by members of the [] class" and whose conduct "forms a significant basis for the claims asserted . . . ." 28 U.S.C. § 1332(d)(4)(A).

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

199.    Likewise, federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 is not invoked because the allegations are wholly state law claims. Nowhere does Jackson County plead, expressly or implicitly, any cause of action or request any remedy that arises under or is founded upon federal law. The issues presented in the allegations of this Petition do not implicate significant or substantial federal issues and do not turn on the necessary interpretation of any federal law. Jackson County expressly avers that the only causes of action claimed, and the only remedies sought herein, are founded upon the common law of the State of Missouri.

200.    Similarly, Jackson County does not seek any relief on behalf of individual patients or consumers within Missouri. Thus, Jackson County's Petition does not involve any federal issue nor does it require the interpretation and/or application of federal law, nor does it implicate any federal aid programs.

201.    This Court has personal jurisdiction over Defendants under Missouri's long-arm statute, codified at Mo. Rev. Stat. § 506.500.

202.    Venue is proper in Jackson County, Missouri under Mo. Rev. Stat. § 508.010.

## FACTUAL ALLEGATIONS

**Diabetes and Insulin Therapy.**

### *Diabetes: A growing epidemic.*

203.    Diabetes is a disease that occurs when a person's blood glucose, also called blood sugar, is too high. In a non-diabetic person, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to glucose, or sugar, in the blood. When there is not enough insulin or cells stop responding to insulin, too much blood sugar stays in the bloodstream. Over time, that can cause serious health problems, such as heart disease, vision loss, and kidney disease.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

204.    There are two basic types of diabetes. Roughly 90-95% of diabetics developed the disease because they do not produce enough insulin or have become resistant to the insulin their bodies do produce. Known as Type 2, this form of diabetes is often developed later in life. While Type 2 patients can initially be treated with medication in the form of a pill, in the long term most patients require insulin injections.

205.    The other type of diabetes, known as Type 1 diabetes, occurs when a patient completely ceases insulin production. In contrast to Type 2 patients, people with Type 1 diabetes do not produce any insulin and, without regular injections of insulin, will die.

206.    Insulin treatments are a necessary part of life for those who have diabetes. Interruptions to a diabetic's insulin regimen can have severe consequences. Missed or inadequate insulin therapy can trigger hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days.

207.    The number of Americans with diabetes has exploded in the last half century. In 1958, only 1.6 million people in the United States had diabetes. By the turn of the century, that number had grown to more than 10 million people. Fourteen (14) years later, the count tripled again. Now more than 30 million people—9.4% of the country—live with the disease.

### *Insulin: A century old drug.*

208.    Despite its potentially deadly impact, diabetes is a highly-treatable illness. For patients who are able to follow a prescribed treatment plan consistently, many of the health complications associated with the disease are avoidable.

209.    Unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

210.    In 1922, Frederick Banting and Charles Best, while working at the University of Toronto, pioneered a technique for removing insulin from an animal pancreas that could then be used to treat diabetes. After discovery, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 (equivalent to $14 today), explaining "[w]hen the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."

211.    After purchasing the patent, the University of Toronto contracted with Defendants Eli Lilly and Novo Nordisk to scale their production. Under this arrangement, Eli Lilly and Novo Nordisk were allowed to apply for patents on variations to the manufacturing process.

212.    Although early iterations of insulin were immediately perceived as lifesaving, there have been numerous incremental improvements since its discovery. The earliest insulin was derived from animals and, until the 1980s, was the only treatment for diabetes.

213.    While effective, animal-derived insulin created the risk of allergic reaction. This risk was lessened in 1982 when synthetic insulin, known as human insulin, was developed by Defendant Eli Lilly. Eli Lilly marketed this insulin as Humulin. The development of human insulin benefited heavily from government and non-profit funding through the National Institute of Health and the American Cancer Society.

214.    Over a decade later, Defendant Eli Lilly developed the first analog insulin, Humalog, in 1996.

215.    Analog insulin is laboratory grown and genetically-altered insulin. Analogs are slight variations on human insulin that make the injected treatment act more like the insulin naturally produced and regulated by the body.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

216.     Other rapid-acting analogs are Defendant Novo Nordisk's Novolog and Defendant Sanofi's Apidra, with similar profiles. Diabetics use these rapid-acting insulins in combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir.

217.     Manufacturer Defendants introduced these rapid-acting and long-acting analog insulins between 1996 and 2007.

218.     In 2015, Sanofi introduced Toujeo, another long-acting insulin also similar to Lantus, however Toujeo is highly concentrated, making injection volume smaller than Lantus.

219.     In 2016, Eli Lilly introduced Basaglar, which is a long-acting insulin that is biologically similar to Sanofi's Lantus.

220.     Even though insulin was first extracted nearly 100 years ago, only Defendants Eli Lilly, Novo Nordisk, and Sanofi manufacture insulin in the United States.

### *Current insulin landscape.*

221.     All the insulins at issue in this case have either been available in the same form since the late 1990s/early 2000s or are biologically equivalent to insulins that were available then.

222.     Dr. Kasia Lipska, a Yale researcher and author of a 2018 study in the Journal of the American Medical Association on the cost of insulin, explained:

> We're not even talking about rising prices for better products here. I want to make it clear that we're talking about rising prices for the same product . . . there's nothing that's changed about Humalog. It's the same insulin that's just gone up in price and now costs ten times more.

223.     The production and research and development costs have also not increased. In fact, in the last 10 years, the production costs of insulin have decreased as manufacturers simplified and optimized processes. A September 2018 study published in BMJ Global Health calculated that, based on production costs, a reasonable price for a year's supply of human insulin is $48 to $71

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

per person and between $78 and $133 for analog insulins—which includes delivering a profit to manufacturers.[12]

224. These figures stand in stark contrast to the $5,705 that a diabetic spent, on average, for insulin in 2016.

225. Further, while research and development costs often make up a large percentage of the price of a drug, in the case of insulin the initial basic research— original drug discovery and patient trials—was performed 100 years ago. Even the more recent costs, such as developing the recombinant DNA fermentation process and the creation of insulin analogs, were incurred decades ago by the Manufacturers.

226. Despite this decrease in production costs, and no new research and development, the reported price of insulins has risen astronomically over the last 15 years.

### _Insulin adjuncts: Type 2 medications._

227. Over the past decade, Manufacturer Defendants have also released a number of non-insulin medications that help control the level of insulin in the bloodstream of Type 2 diabetics.

228. In 2010, Novo Nordisk released Victoza as an adjunct to insulin to improve glycemic control. In 2014, Eli Lilly released a similar drug, Trulicity. In 2016, Sanofi did the same with Soliqua, and in 2017, Novo Nordisk did the same with Ozempic.

229. Victoza, Trulicity, and Ozempic are all medications known as glucagon- like peptide-1 receptor agonists ("GLP-1") and are similar to the GLP-1 hormone that is already produced in the body. Soliqua is a combination long-acting insulin and GLP-1 drug. Each of these drugs can be used in conjunction with insulins to control diabetes.

---

[12] Available at https://gh.bmj.com/content/3/5/e000850

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

230.    The following is a list of diabetes medications at issue in this lawsuit:

**Table 1: Diabetes medications at issue**

| Insulin Type | Action | Name | Company | FDA Approval | Current Price |
|---|---|---|---|---|---|
| *Human* | **Rapid-Acting** | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | Humulin R 500 | Eli Lilly | 1994 | $1,784 (vial) $689 (pens) |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | **Intermediate** | Humulin N | Eli Lilly | 1982 | $178 (vial) $566 (pens) |
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial) $566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| *Analog* | **Rapid-Acting** | Humalog | Eli Lilly | 1996 | $342 (vial) $636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial) $671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial) $658 (pens) |
| | **Long-Acting** | Lantus | Sanofi | 2000 | $ 340 (vial) $510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $ 370 (vial) $ 555 (pens) |
| | | Basaglar (Kwikpen) | Eli Lilly | 2016 | $392 (pens) |
| | | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens) $622 (max pens) |
| | | Tresiba | Novo Nordisk | 2015 | $407 (vial) $610 (pens – 100u) $732 (pens – 200u) |
| *Type 2 Medications* | | Trulicity | Eli Lilly | 2014 | $1,013 (pens) |
| | | Victoza | Novo Nordisk | 2010 | $813 (2 pens) $1,220 (3 pens) |
| | | Ozempic | Novo Nordisk | 2017 | $1,022 (pens) |

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

| | | Soliqua | Sanofi | 2016 | $927.90 (pens) |
|---|---|---|---|---|---|

**The Dramatic Rise in the Price of Diabetes Medications.**

*Insulin price increases.*

231.   In 2003, the price of insulin began its dramatic rise to its current exorbitant level.

232.   Since 2003, the list price of certain insulins has increased in some cases by more than 1,000% — an astounding increase especially when compared to a general inflation rate of 8.3% and a medical inflation rate of 46% in this same time period.

233.   By 2016, the average price per month of the four most popular types of insulin rose to $450, and costs continue to rise, so much so that now one in four diabetics is skimping on or skipping lifesaving doses. This behavior is dangerous to a diabetic's health and can lead to a variety of complications and even death.

234.   Since 1997, Defendant Eli Lilly has artificially inflated the list price of a vial of Humulin R (500U/ML) from $165 to $1,784 (See Figure 2).

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

**Figure 2: Rising list prices of Humulin R (500U/mL) from 1997-2021**



Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

235.    Since 1996, Defendant Eli Lilly has artificially inflated the list price for a package of pens of Humalog from less than $100 to $663, and from less than $50 to $342 per vial (See Figure 3).

**Figure 3: Rising list prices of Humalog vials and pens from 1996-2021**



Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

236.    Novo Nordisk has also artificially inflated the list prices—from 2006 to 2020, Levemir rose from $162 to $555 for pens, and from under $100 to $370 per vial (See Figure 4).

**Figure 4: Rising list prices of Levemir from 2006-2021**



Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

237.    From 2002 to 2020, Novo Nordisk has artificially inflated the list price of Novolog

from $108 to $671 for a package of pens, and from less than $50 to $347 per vial (See Figure 5).

**Figure 5: Rising list prices of Novolog vials and pens from 2002-2021**



Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

238.    Defendant Sanofi has kept pace as well, artificially inflating the list price for Lantus, the top-selling analog insulin, from less than $200 in 2006, to more than $500 in 2020 for a package of pens, and from less than $50 to $340 per vial (See Figure 6).

**Figure 6: Rising list prices of Lantus vials and pens from 2001-2021**



239.    Manufacturer Defendants' non-insulin diabetes medications have experienced similar recent price increases. For example, since 2015, Eli Lilly has artificially inflated the list price of Trulicity by almost 50%.

240.    Driven by these price hikes, payors' and diabetics' spending on diabetes medications has skyrocketed.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

### *Manufacturers increased prices in lockstep.*

241.     The timing of the list price increases reveal that each Manufacturer Defendant has not only dramatically increased prices for the at-issue diabetes treatments, but they have also done so in perfect lockstep.

242.     In 13 instances since 2009, competitors Sanofi and Novo Nordisk raised the list prices of their insulins, Lantus and Levemir, in tandem, applying the same price increase within a few days of each other.

243.     This practice of increasing drug prices in lockstep with competitors is known as "shadow pricing" and, as healthcare expert Richard Evans from SSR Health recently stated, "is pretty much a clear signal that your competitor does not intend to price-compete with you."

244.     Novo Nordisk and Sanofi's lockstep increases for the at-issue drugs were responsible for the highest drug price increases in the entire pharmaceutical industry during 2016.

245.     Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog. Figure 7 demonstrates this collusive behavior with respect to Lantus and Levemir. Figure 8 demonstrates this behavior with respect to Humalog and Novolog.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

**Figure 7: Rising list prices of long-acting insulins**



Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

**Figure 8: Rising list prices of rapid-acting insulins**



Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

246.     Figure 9 demonstrates this behavior with respect to the human insulins, Eli Lilly's

Humulin and Novo Nordisk's Novolin.

**Figure 9: Rising list price increases for human insulins**



Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

247.    Figure 10 demonstrates Manufacturer Defendants' lockstep price increases for their

Type 2 drugs, Trulicity, Victoza, and Ozempic.

**Figure 10: Rising list prices of Type 2 drugs**



Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

248.    Figure 11 shows how, collectively, Manufacturer Defendants have exponentially raised the prices of insulin products in near perfect unison for decades.

**Figure 11: Lockstep insulin price increases**



249.    Because of Manufacturer Defendants' lockstep price increases, nearly a century after the discovery of insulin, diabetes medications have become unaffordable for many diabetics.

**Pharmaceutical Payment and Supply Chain.**

250.    The prescription drug industry consists of a deliberately opaque network of entities engaged in multiple distribution and payment structures. These entities include drug manufacturers, wholesalers, pharmacies, health plans/third party payors, pharmacy benefit managers, and patients.

251.    Generally speaking, branded prescription drugs, such as the at-issue diabetes medications, are distributed in one of two ways: (1) from manufacturer to wholesaler, wholesaler to pharmacy, and pharmacy to patient; or (2) from manufacturer to mail-order pharmacy, and mail-order pharmacy to patient.

252.    The pharmaceutical industry, however, is unique in that the pricing chain is distinct from the distribution chain. The prices for the drugs distributed in the pharmaceutical chain are

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

different for each participating entity: different actors pay different prices set by different entities for the same drugs. The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is directly tied to the manufacturer's list price.

253.    There is no transparency in this pricing system; typically, only a brand drug's list price—also known as its Average Wholesale Price (AWP) or the mathematically-related Wholesale Acquisition Cost (WAC)—is available. To note, "Wholesale Acquisition Cost" is not the final price that wholesalers (or any other entity in the pharmaceutical pricing chain) pay for the Manufacturers' drugs. The final price that a wholesaler pays the Manufacturers is less than WAC because of post-purchase discounts.

254.    Drug manufacturers self-report AWP, or other prices upon which AWP is based, to publishing compendiums such as First DataBank, Redbook, and others who then publish that price.

255.    As a direct result of the PBMs' conduct, AWP persists as the most commonly and continuously used list price in reimbursement and payment calculations and negotiations for both payors and patients.

### *PBMs' role in the pharmaceutical payment chain.*

256.    PBMs are at the center of the convoluted pharmaceutical payment chain, as reflected in Figure 12:

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM



**Figure 12: Pharmaceutical Supply Chain**



257.    The PBM Defendants develop drug formularies, process claims, create a network of retail pharmacies, set the prices in coordination with the Manufacturers that payors pay for prescription drugs, and are paid by payors for the drugs utilized by a payor's beneficiaries.

258.    PBMs also contract with a network of retail pharmacies often owned by the PBM. Pharmacies agree to dispense drugs to patients and pay fees back to the PBMs. PBMs reimburse pharmacies for the drugs dispensed.

259.    PBM Defendants also own mail order, retail, and specialty pharmacies, which purchase and take possession of prescription drugs, including those at issue here, and directly supply those drugs to patients.

260.    Often—including for at-issue drugs—the PBM Defendants purchase drugs from the Manufacturers and dispense them to the patients.

261.    Even where PBM Defendants' pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the Manufacturers.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

262.    In addition, and of particular significance here, PBM Defendants contract with pharmaceutical manufacturers, including Manufacturer Defendants.

263.    These relationships allow PBMs to exert tremendous influence over what drugs are available throughout Missouri and at what prices.

264.    Thus, PBMs are at the center of the flow of money in the pharmaceutical supply chain. In sum:

    a.    PBMs negotiate the price that payors pay for prescription drugs (for the at-issue drugs based on artificially-inflated prices generated by the Insulin Pricing Scheme);

    b.    PBMs separately negotiate a different (and often lower) price that pharmacies in their networks receive for that same drug;

    c.    PBMs set the amount in fees that the pharmacy pays back to the PBM for each drug sold (for the at-issue drugs based on artificially-inflated prices generated by the Insulin Pricing Scheme);

    d.    PBMs set the price paid for each drug sold through their mail-order pharmacies (for the at-issue drugs based on artificially-inflated prices generated by the Insulin Pricing Scheme); and

    e.    PBMs negotiate the amount that the Manufacturers pay back to the PBM for each drug sold (for the at-issue drugs based on artificially inflated prices generated by the Insulin Pricing Scheme).

265.    Yet, for the majority of these transactions, only the PBMs are privy to the amount that any other entity in this supply chain is paying or receiving for the exact same drugs.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

266.    In every interaction that PBMs have within the pharmaceutical pricing chain the stand to profit from the artificial prices generated by the Insulin Pricing Scheme.

### *The rise of the PBMs in the pharmaceutical supply chain.*

267.    When they first came into existence in the 1960s, PBMs functioned largely as claims processors. Over time, however, they have taken on a larger role in the pharmaceutical industry. Today, PBMs wield significant control over the drug pricing system.

268.    PBMs began negotiating with drug manufacturers ostensibly on behalf of payors.

269.    In the early 2000s, PBMs started buying pharmacies.

270.    When a PBM combines with a pharmacy, it has an increased incentive to collude with Manufacturers to keep certain prices high.

271.    These unconscionable incentives still exist today with respect to both retail and mail-order pharmacies housed within the PBMs' corporate families.

272.    More recently, further consolidation in the industry has afforded PBMs a disproportionate amount of market power.

273.    In addition, each of the PBM Defendants are now owned by other significant players within the pharmaceutical chain: Express Scripts merged with Cigna in a $67 billion-dollar deal; Caremark was bought by the largest pharmacy in the United States, CVS, for $21 billion; CVS also now owns Aetna following a $69 billion-dollar deal; and OptumRx was acquired by the largest health insurance company in the United States, UnitedHealth Group.

274.    After merging or acquiring all their competitors and now backed by multi-billion-dollar corporations, PBM Defendants have taken over the market— controlling more than 80% of the market and managing pharmacy benefits for more than 270 million Americans.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

275.     PBM Defendants have near complete control over the Manufacturer Payment market. In addition to their own clients, which represents 80% of the market, PBM Defendants or their controlled affiliate rebate aggregator companies contract with most smaller pharmacy benefit managers, including the largest of those, Prime Therapeutics, to negotiate Manufacturer Payments on their behalf.

276.     PBMs are able to use the consolidation in the market as leverage when negotiating with other entities in the pharmaceutical pricing chain. Industry expert Lindsay Bealor Greenleaf from Advice and Vision for the Healthcare Ecosystem (ADVI) described this imbalance in power, "it's really difficult to engage in any type of fair negotiations when one of the parties has that kind of monopoly power. . . I think that is something that is going to continue getting attention, especially as we see more of these payors and PBMs continue to try to further consolidate."

**The Insulin Pricing Scheme.**

277.     The market for the at-issue diabetes medications is unique in that it is highly concentrated with, until recently, little to no generic/biosimilar options and the drugs have similar efficacy and risk profiles. In fact, PBMs treat the at-issue drugs as commodity products in constructing their formularies.

278.     In such a market, where manufacturing costs have significantly decreased, PBMs should have great leverage in negotiating with the Manufacturer Defendants to drive prices down in exchange for formulary placement.

279.     But the PBMs do not want the prices for diabetes medications to go down because they make more money on higher prices, as do the Manufacturers.

280.     As a result, Defendants have found a way to game the system for their mutual benefit—the Insulin Pricing Scheme.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

281.    PBM Defendants' formularies are at the center of the Insulin Pricing Scheme. Given the asymmetry of information and disparity in market power between payors and PBM Defendants, and the costs associated with making formulary changes, most payors accept the standard formularies offered by the PBMs.

282.    Manufacturer Defendants recognize that because PBM Defendants have such a dominant market share, if they chose to exclude a particular diabetes medication from their standard formularies, or give it a non-preferred position, it could mean billions of dollars in profit loss for Manufacturer Defendants.

283.    For example, Olivier Brandicourt, Sanofi's CEO, in a recent interview stressed the importance of the PBMs' standard formularies: "if you look at the way [CVS Caremark] is organized in the US . . . 15 million [lives] are part of [CVS Caremark's standard] formulary and that's very strict, all right. So, [if we were not included in CVS Caremark's standard formulary] we wouldn't have access to those 15 million lives."

284.    Manufacturer Defendants also recognize that the PBM Defendants' profits are directly tied to the Manufacturers' list prices. For example, the January 2021 Senate Insulin Report, in summarizing the internal documents produced by the Manufacturers, noted the following:

> [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price . . . In other words, the drug makers were aware that higher list prices meant higher revenue for PBMs.

285.    Because the Manufacturer Defendants know that—contrary to their public representations—PBM Defendants make more money from increasing prices, over the course of the last 15 years and working in coordination with the PBMs, the Manufacturers have artificially inflated their list prices for the at-issue drugs exponentially, while largely maintaining their net prices by paying larger and larger amounts of Manufacturer Payments back to the PBMs.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

286.     In exchange for the Manufacturers inflating these prices and paying the PBMs substantial amounts in Manufacturer Payments, PBM Defendants grant preferred status on their standard formularies to the Manufacturer Defendants' diabetes medications with the most elevated price and that are the most profitable to the PBMs.

287.     At all times relevant hereto, the PBM Defendants have known that the list prices for the at-issue drugs are grossly inflated. Indeed, the Manufacturers' list prices have become so untethered from the Manufacturers' net prices[13] as to constitute false and unlawful prices.

288.     Despite this knowledge, PBMs include this false and deceptive price— often the AWP price—in their contracts as a basis to set the rate that payors pay for the at-issue drugs and pharmacies are reimbursed for the at-issue drugs.

289.     Moreover, the PBMs also use this false price to misrepresent the amount of "savings" they generate for diabetics, payors, and the healthcare system. For example, in January 2016, Express Scripts' president Tim Wentworth stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts "saved our clients more than $3 billion through the Express Scripts National Preferred Formulary." Likewise, in April 2019, CVS Caremark president Derica Rice stated, "Over the last three years . . . CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend."[14]

290.     The PBM Defendants also misrepresent the amount of "savings" they generate to their payor clients and prospective clients.

---

[13] "Net Price" refers to the Manufacturers' list price minus all Manufacturer Payments paid to the PBMs.

[14] CVS News Release *"CVS Health PBM Solutions Blunted the Impact of Drug Price Inflation, Helped Reduce Member Cost, and Improved Medication Adherence in 2018"* (April 11, 2019) ( available at https://www.biospace.com/article/releases/cvs-health-pbm-solutions-blunted-the-impact-of-drug-price-inflation-helped-reduce-member-cost-and-improved-medication-adherence-in-2018/) (last accessed June 30, 2022).

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

291.    In making these representations, the PBMs fail to disclose that the amount of "savings" they have generated is calculated based on the false list price, which is not paid by any entity in the pharmaceutical pricing chain and which the PBMs are directly responsible for artificially inflating.

292.    Far from using their prodigious bargaining power to lower drug prices as they claim, Defendants use their dominant positions to work together to generate billions of dollars at the expense of healthcare payors like Jackson County and the Class.

**Defendants Admit That They Have Engaged in the Insulin Pricing Scheme.**

293.    On April 10, 2019, the United States House of Representatives Committee on Energy and Commerce held a hearing on Defendants' Insulin Pricing Scheme titled, "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."

294.    Representatives from all Defendants testified at the hearing and each acknowledged before Congress that the price for insulin has increased exponentially in the past 15 years.

295.    Representatives from each Defendant explicitly admitted that the price that diabetics have to pay out-of-pocket for insulin is too high. For example:

     a.   Dr. Sumit Dutta, Chief Medical Officer of OptumRx stated, "A lack of meaningful competition allows the [M]anufacturers to set high [list] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."

     b.   Thomas Moriarty, Chief Policy and External Affairs Officer and General Counsel for CVS Health testified, "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

expensive for too many Americans. Over the last several years, [list] prices for insulin have increased nearly 50 percent. And over the last ten years, [list] price of one product, Lantus, rose by 184 percent."

c.   Mike Mason, Senior Vice President of Eli Lilly when discussing how much diabetics pay out-of-pocket for insulin stated "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications . . ."

d.   Kathleen Tregoning, Executive Vice President External Affairs at Sanofi, testified, "Patients are rightfully angry about rising out-of- pocket costs and we all have a responsibility to address a system that is clearly failing too many people. . . we recognize the need to address the very real challenges of affordability . . . Since 2012, average out-of- pocket costs for Lantus have risen approximately 60 percent for patients . . ."

e.   Doug Langa, Executive Vice President of Novo Nordisk, stated, "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the [list] prices of our medicines. We also know that [list] price matters to many, particularly those in high-deductible health plans and those that are uninsured."[15]

296.   Notably, none of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased production costs or improved clinical benefit.

---

[15] Testimony for each witness available at https://www.congress.gov/event/116th-congress/house-event/109299

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

297.     Defendants admitted that they agreed to and did participate in the Insulin Pricing Scheme and that the rise in prices was a direct result of the scheme.

298.     For example, at the April 2019 congressional hearing, Novo Nordisk's President, Doug Langa, explained Novo Nordisk's and PBM Defendants' role in perpetuating the "perverse incentives" of the Insulin Pricing Scheme:

> [T]here is this perverse incentive and misaligned incentives (in the insulin pricing system) and this encouragement to keep [list] prices high. And we've been participating in that system because the higher the [list] price, the higher the rebate . . . There is a significant demand for rebates. We spend almost $18 billion in rebates in 2018 . . .
>
> **[I]f we eliminate all the rebates . . . we would be in jeopardy of losing [our formulary] positions.**

299.     Eli Lilly, too, has admitted that it raises list prices as a quid pro quo for formulary positions. At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly testified:

> **Seventy-five percent of our [list] price is paid for rebates and discounts to secure [formulary position]**.
>
> ***
>
> **We have to provide rebates [to PBMs] in order to provide and compete for [formulary position].**

300.     Sanofi has also conceded its participation in the Insulin Pricing Scheme. When testifying at the April 2019 Congressional hearing, Kathleen Tregoning, Executive Vice President for External Affairs of Sanofi, testified:

> The rebates are how the system has evolved. . . I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.

301.     PBM Defendants also admitted at the April 2019 congressional hearing that they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by Manufacturer Defendants. Amy Bricker, President of Express Scripts, when asked to explain why Express Scripts did not grant an insulin with a lower list price preferred formulary status, answered, **"Manufacturers do give higher [payments] for exclusive [formulary] position** . . ."

302.     While all Defendants acknowledged their participation in the Insulin Pricing Scheme before Congress, in an effort to avoid culpability for the precipitous price increase, each Defendant group pointed the finger at the other as the responsible party.

303.     PBM Defendants specifically testified to Congress that Manufacturer Defendants are solely responsible for their price increases and that the Manufacturer Payments that the PBMs receive are not correlated to rising insulin prices.

304.     But the Manufacturers' coordinated lockstep price increases are a direct reflection of the PBMs' coordinated requests for larger Manufacturer Payments. A February 2020 study by the Leonard D. Schaeffer Center for Health Policy & Economics at the University of South California titled "The Association Between Drug Rebates and List Prices," found that an increase in the amount that the Manufacturers pay back to the PBMs is directly correlated to an increase in prices—on average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in price—and that reducing or eliminating Manufacturer Payments could result in lower prices and reduced out-of-pocket expenditures.[16]

---

[16] Available at https://www.healthpolicy.usc.edu/wp-content/uploads/2020/02/SchaefferCenter_RebatesListPrices_WhitePaper.pdf

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

305.     In addition, a recent report by the National Community Pharmacists Association estimated that Manufacturer Payments add nearly 30 cents per dollar to the price consumers pay for prescriptions.

306.     Further, in large part because of the increased list prices, and related Manufacturer Payments, PBMs' profit per prescription has grown exponentially over the same time period that insulin prices have been artificially increased. By way of example, since 2003, Defendant Express Scripts has seen its profit per prescription increase more than 500% per adjusted prescription.

307.     The Manufacturers, on the other hand, argued before Congress that the PBMs were to blame for high insulin prices because of the PBMs' demands for higher Manufacturer Payments in exchange for formulary placement.

308.     But that also is not true. For example, a 2020 study from the Institute of New Economic Thinking titled, "Profits, Innovation and Financialization in the Insulin Industry," demonstrates that Manufacturer Defendants are still making substantial profits from the sale of insulin products regardless of any Manufacturer Payments they are sending back to the PBMs. During the same time period when insulin price increases were at their steepest, distributions to Manufacturers' shareholders in the form of cash dividends and share repurchases totaled $122 billion. In fact, during this time period the Manufacturers spent a significantly lower proportion of profits on research and development compared to shareholder payouts.[17]

309.     The January 2021 Senate Insulin Report concluded, inter alia:

a.     Manufacturer Defendants are retaining more revenue from insulin than in the 2000s—for example, Eli Lilly has reported a steady increase in Humalog

---

[17] Collington, Rosie, Profits, Innovation and Financialization in the Insulin Industry (March 30, 2020). Institute for New Economic Thinking Working Paper Series No. 120, available at SSRN: https://ssrn.com/abstract=3593906

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

revenue for more than a decade—from $1.5 billion in 2007 to $3 billion in 2018;

b.   Manufacturer Defendants have aggressively raised the list price of their insulin products absent significant advances in the efficacy of the drugs; and

c.   Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on research and development—Eli Lilly spent $395 million on R&D costs for Humalog, Humulin, and Basaglar between 2014-2018 during which time the company generated $22.4 billion in revenue on these drugs. From 2016 to 2020, Novo Nordisk spent approximately $29 billion on stock buybacks and shareholder dividend payouts while only spending approximately $12 billion on R&D costs.[18]

310.   The truth is—despite their finger pointing in front of Congress— Manufacturers and PBMs are both responsible for their concerted efforts in creating the Insulin Pricing Scheme. This reality was echoed in the statement from the 2021 Senate Insulin Report, summarizing Congress's findings from their two-year probe into the Insulin Pricing Scheme:

> [M]anufacturers and [PBMs] have created a vicious cycle of price increases that have sent costs for patients and taxpayers through the roof . . . This industry is anything but a free market when PBMs spur drug makers to hike list prices in order to secure prime formulary placement and greater rebates and fees.

**Defendants' Recent Efforts in Response to Rising Insulin Prices.**

311.   Defendants have recently begun introducing programs ostensibly aimed at lowering the cost of insulins. However, these "affordability" measures fail to address the structural issues

---

[18] Available at https://www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

that have given rise to the price hikes. Rather, these steps are merely public relations stunts that do not solve the problem.

312.     For example, in March 2019, Defendant Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it would "work quickly with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."

313.     However, in the months after Eli Lilly's announcement, reports raised questions about the availability of "Insulin Lispro" in local pharmacies.

314.     Following this, a Congressional staff report was issued examining the availability of this drug. The investigative report, "Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic," concluded that Eli Lilly's lower-priced, authorized generic insulin is widely unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability.

315.     The conclusion of the report was that: "Eli Lilly has failed to deliver on its promise to put a more-affordable insulin product on the shelves. Instead of giving patients access to its generic alternative, this pharmaceutical behemoth is still charging astronomical prices for a drug people require daily and cannot live without."

316.     In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart. However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins and should only be used in an emergency or when traveling. In particular, for many diabetics, especially Type 1 diabetics, these insulins can be dangerous.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

317.    Thus, Defendants' "lower priced" insulin campaigns have not addressed the problem.

## TOLLING

318.    Through no fault of their own, neither Jackson County nor the Class received inquiry notice or learned of the factual basis for its claims in this Petition and the injuries suffered therefrom until recently. Consequently, the following tolling doctrines apply:

**Discovery Rule Tolling**

319.    As discussed above, PBM Defendants and Manufacturer Defendants refused to disclose the actual prices of diabetes medications realized by Defendants, the details of the Defendants' negotiations and payments between each other or their pricing structures and agreements—labeling them trade secrets and protecting them with confidentiality agreements.

320.    Each Defendant group also affirmatively blamed the other for the price increases described herein, both during their congressional testimonies and through the media. Defendants essentially continued to work and conspire together to conceal their fraudulent misrepresentations in their blame of the other.

321.    Jackson County and the Class could not have discovered and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the Insulin Pricing Scheme, nor would a reasonable and diligent investigation have disclosed the true facts.

322.    Even today, lack of transparency in the pricing of diabetes medications and the arrangements, relationships and agreements between and among Manufacturer Defendants and PBM Defendants that result from the Insulin Pricing Scheme continue to obscure Defendants' unlawful conduct.

323.    For these reasons, the discovery rule tolls all applicable statutes of limitations.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

**Fraudulent Concealment Tolling**

324.    Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein, as described in detail above, also tolls any applicable statutes of limitation.

**Estoppel**

325.    Defendants were under a continuous duty to disclose to Jackson County and the Class the true character, quality and nature of the prices upon which payments for diabetes medications were based, and the true nature of the services being provided.

326.    But Defendants intentionally misrepresented the prices. Due to Defendants' misrepresentations, they benefitted from inducing Jackson County, the Class, and other payors to rely upon their misrepresentations.

327.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**Continuing Violations**

328.    Any applicable statutes of limitations are also tolled because Defendants' activities have not ceased and still continue to this day and thus any causes of action are not complete and do not accrue until the tortious and anticompetitive acts have ceased.

**CLASS ACTION ALLEGATIONS**

329.    Jackson County, on behalf of itself and the proposed Class, re-alleges the foregoing paragraphs as it fully set forth herein.

330.    Plaintiff seeks to represent the following Class:

**Missouri counties and municipalities with a population greater than 20,000 according to the 2020 United States Census.[19]**

---

[19] A list of the Class members may be found in Exhibit A, attached hereto.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

331.     This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria set forth in Missouri Supreme Court Rule 52.08.

332.     **Numerosity**. The proposed Class satisfies the numerosity requirements under Rule 52.08 in that its members are too numerous to practically join in a single action. Class members may be notified of the pendency of this action by mail or other means.

333.     **Predominance**. Common questions of law and fact exist as to all members of the proposed Class and predominate over questions affecting only individual class members. These common questions include whether:

a.     Defendants engaged in the Insulin Pricing Scheme;

b.     Defendants concealed and/or hid their conduct in the Insulin Pricing Scheme;

c.     Defendants were unjustly enriched under Missouri law due to the Insulin Pricing Scheme;

d.     Defendants' conduct caused injury to Jackson County and the Class;

e.     Jackson County and the Class are entitled to damages; and

f.     Jackson County and the Class satisfy the requirements of Missouri Supreme Court Rule 52.08.

334.     **Typicality**. Plaintiff's claims are typical of the claims of the proposed Class because it paid for insulin for its employees through its health care plan; this similarity gives rise to substantially the same claims as the proposed Class.

335.     **Adequacy**. Plaintiff is an adequate representative of the proposed Class because its interests do not conflict with the interests of the members of the Class that it seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously by monitoring and directing the actions of class

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

counsel. The interests of members of the Class will be fairly and adequately protected by Plaintiff and its counsel.

336.    **Superiority**. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if Class members availed themselves of individual litigation, the court system could not sustain such an imposition. In addition to the burden and expense of managing many actions arising from the Insulin Pricing Scheme, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

337.    In the alternative, the proposed Class may be certified because:

a.    the prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for Defendants;

b.    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

c.      Defendants have acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed Class as a whole.

### CLAIMS FOR RELIEF

**Count I**
**Unjust Enrichment**
**(Plaintiff Individually and on behalf of the proposed Class against all Defendants)**

338.    Jackson County, on behalf of itself and the proposed Class, re-alleges the foregoing paragraphs as it fully set forth herein.

339.    Jackson County and the Class have conferred benefits upon Defendants in the form of healthcare payments for their employees.

340.    Defendants have been and continue to be enriched by the benefits conferred by Jackson County and the Class.

341.    By virtue of the Insulin Pricing Scheme outlined herein, Defendants' enrichment is unjust and inequitable, and Defendants' enrichment is at the expense of healthcare payors such as Jackson County and the Class.

342.    Accordingly, it would be unjust to allow Defendants to retain the benefits conferred upon them at the expense of Jackson County and the Class.

343.    Jackson County and the Class seek actual damages; a declaration that Defendants have been unjustly enriched in violation of Missouri law; and injunctive relief prohibiting Defendants from continuing to engage in the wrongful conduct outlined herein.

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

**Count II**
**Civil Conspiracy**
**(Plaintiff Individually and on behalf of the proposed Class against all Defendants)**

344.    Jackson County, on behalf of itself and the proposed Class, re-alleges the foregoing paragraphs as it fully set forth herein.

345.    As set forth herein, two or more Defendants engaged in the Insulin Pricing Scheme.

346.    The Insulin Pricing Scheme was an unlawful object to be accomplished for the purpose of unjustly enriching Defendants at the expense of Jackson County and the Class.

347.    Defendants achieved a meeting of the minds on the Insulin Pricing Scheme.

348.    Defendants individually and collectively engaged in one or more unlawful overt acts to perpetuate and enact the Insulin Pricing Scheme.

349.    Defendants' civil conspiracy damaged Jackson County and members of the Class in their capacity as payors for employee health plans.

350.    Jackson County and the Class seek actual damages.

**PRAYER FOR RELIEF**

WHEREFORE, Jackson County requests that the Court enter a judgment awarding the following relief:

a.    An order certifying the proposed Class and appointing Jackson County and its counsel to represent the Class;

b.    An order awarding Jackson County and the Class members their actual damages, and/or any other form of monetary relief provided by and pursuant law;

c.    An order enjoining Defendants from further engage in the Insulin Pricing Scheme outlined herein; and

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

d.  An order awarding Jackson County Plaintiff and the Class pre-judgment and post-

judgment interest as allowed under the law.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims so triable.

DATE: January 11, 2023                    Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**

*/s/ Matthew L. Dameron*

| | |
|---|---|
| Matthew L. Dameron | MO Bar No. 52093 |
| Michael A. Williams | MO Bar No. 47538 |
| Eric L. Dirks | MO Bar No. 54921 |

1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:          (816) 945-7100
Facsimile:          (816) 945-7118
matt@williamsdirks.com
mwilliams@williamsdirks.com
dirks@williamsdirks.com

**OFFICE OF THE JACKSON COUNTY COUNSELOR**
Bryan O. Covinsky
County Counselor
415 East Twelfth Street, Suite 200
Kansas City, Missouri 64106
Telephone:          (816) 881-3442
Facsimile:          (816) 881-3398
bcovinsky@jacksongov.org

2316-CV01801

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

**EXHIBIT A**
**Missouri Counties and Cities Within Proposed Class Definition**
**(Petition at ¶ 330)**

| NO. | JURISDICTION | POPULATION |
|---|---|---|
| 1 | St. Louis County | 1,004,125 |
| 2 | Jackson County | 717,204 |
| 3 | City of Kansas City | 508,090 |
| 4 | St. Charles County | 405,262 |
| 5 | City of St. Louis | 301,578 |
| 6 | Greene County | 298,915 |
| 7 | Clay County | 253,335 |
| 8 | Jefferson County | 226,739 |
| 9 | Boone County | 183,610 |
| 10 | City of Springfield | 169,176 |
| 11 | City of Columbia | 126,254 |
| 12 | City of Independence | 123,011 |
| 13 | Jasper County | 122,761 |
| 14 | Cass County | 107,824 |
| 15 | Platte County | 106,718 |
| 16 | Franklin County | 104,682 |
| 17 | City of Lee's Summit | 101,108 |
| 18 | City of O'Fallon | 91,316 |
| 19 | Christian County | 88,842 |
| 20 | Buchanan County | 84,793 |
| 21 | Cape Girardeau County | 81,710 |
| 22 | Cole County | 77,279 |
| 23 | City of St. Joseph | 72,473 |
| 24 | City of St. Charles | 70,493 |
| 25 | St. Francois County | 66,922 |
| 26 | Lincoln County | 59,574 |
| 27 | Newton County | 58,648 |
| 28 | City of Blue Springs | 58,603 |
| 29 | City of St. Peters | 57,732 |
| 30 | Taney County | 56,066 |
| 31 | Johnson County | 54,013 |
| 32 | Pulaski County | 53,955 |
| 33 | City of Florissant | 52,533 |
| 34 | City of Joplin | 51,762 |
| 35 | City of Chesterfield | 49,999 |
| 36 | Phelps County | 44,638 |
| 37 | City of Wentzville | 44,372 |
| 38 | Callaway County | 44,283 |
| 39 | City of Jefferson | 43,228 |
| 40 | Pettis County | 42,980 |

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

| 41 | Camden County | 42,745 |
| 42 | Butler County | 42,130 |
| 43 | Howell County | 39,750 |
| 44 | City of Cape Girardeau | 39,540 |
| 45 | Webster County | 39,085 |
| 46 | Scott County | 38,059 |
| 47 | Lawrence County | 38,001 |
| 48 | City of Oakville | 36,301 |
| 49 | Laclede County | 36,039 |
| 50 | Warren County | 35,532 |
| 51 | City of Wildwood | 35,417 |
| 52 | University City | 35,065 |
| 53 | Barry County | 34,534 |
| 54 | Lafayette County | 32,984 |
| 55 | Polk County | 31,519 |
| 56 | City of Ballwin | 31,103 |
| 57 | Stone County | 31,076 |
| 58 | City of Liberty | 30,167 |
| 59 | City of Raytown | 30,012 |
| 60 | City of Kirkwood | 29,461 |
| 61 | City of Mehlville | 28,955 |
| 62 | Stoddard County | 28,672 |
| 63 | Marion County | 28,525 |
| 64 | City of Maryland Heights | 28,284 |
| 65 | Dunklin County | 28,283 |
| 66 | City of Gladstone | 27,063 |
| 67 | City of Grandview | 26,209 |
| 68 | City of Hazelwood | 25,548 |
| 69 | Adair County | 25,314 |
| 70 | Audrain County | 24,962 |
| 71 | Miller County | 24,722 |
| 72 | Randolph County | 24,716 |
| 73 | Texas County | 24,487 |
| 74 | City of Webster Groves | 24,010 |
| 75 | City of Belton | 23,953 |
| 76 | Washington County | 23,514 |
| 77 | Saline County | 23,333 |
| 78 | McDonald County | 23,303 |
| 79 | City of Nixa | 23,257 |
| 80 | Ray County | 23,158 |
| 81 | Crawford County | 23,056 |
| 82 | City of Raymore | 22,941 |
| 83 | Henry County | 21,946 |
| 84 | City of Sedalia | 21,725 |
| 85 | City of Ozark | 21,284 |

Electronically Filed - Jackson - Kansas City - January 11, 2023 - 11:07 AM

| 86 | Nodaway County | 21,241 |
| 87 | Clinton County | 21,184 |
| 88 | Morgan County | 21,006 |
| 89 | City of Arnold | 20,858 |
| 90 | City of Affton | 20,417 |